T.C. Memo. 2021-35

UNITED STATES TAX COURT

LINDA J. MARTIN AND JOHN A. MARTIN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10115-15.                    Filed March 24, 2021.

Fritz J. Firman, for petitioners.

Eric M. Heller, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  Linda and John Martin rolled giant losses from the 1990s

onto their 2009 and 2010 joint tax returns, where they also reported some smaller

deductions that related to John's race-car repair business.  The Commissioner

**[*2]** disallowed these deductions and also says they owe penalties for filing late and for being negligent or substantially understating their liabilities.

FINDINGS OF FACT

John Martin has a passion for cars and is a gifted mechanical engineer and veteran race-car driver.[1] His talents emerged when he was very young--he built his first engine when he was only twelve years old, and he has continued to repair and rebuild them with great skill ever since. In the car-racing industry, he is known as someone who "can do it all." Linda Martin is a part-time caregiver and the bookkeeper and brains of Mr. Martin's business. Their partnership has been a success, and as of the time of trial, they had been married for 43 years.

During the 1990s, Martin had his own racing team in Irvine, California, called John Martin Racing. It was this racing business that lost the Martins over $1.7 million after a sponsor fell through. This loss drove the Martins into Chapter 7 bankruptcy in 1997. They were discharged in April 1998. Notwithstanding the bankruptcy petition and discharge, the Martins remembered these large net

---

[1] He was a Sports Car Club of America national champion in 1964, when he drove a 1963 Corvette Stingray that he converted into a production (lightly modified) race car. SVRA Heroes & Friends: Indy Car, Sportscar Vintage Racing Association, https://svra.com/heroes-and-friends/indy-car/ (last visited Mar. 22, 2021). He went professional in 1966, and went on to drive Indy cars in the championship series, including the Indy 500 itself. Id.

**[*3]** operating losses (NOLs), and carried them into the years at issue. Even after this reverse, Martin still did business as John Martin Racing up to and including the years at issue, though his business was no longer a racing team.

A.    The Martins' 2009 and 2010 Tax Years

1.    Martin's Mechanic Work

During the years at issue Martin worked as a traveling mechanic and independent contractor for Landmark Motorsports, Inc. (Landmark), a California-based sports-car racing company. Landmark participated in those years in the American Le Mans Series under the name of Team Falken Tire and used a Porsche as its car of choice. The American Le Mans Series is "an endurance sports car racing series." Racers in this series travel and compete at many venues across the United States and Canada in the spirit of the 24 Hours of Le Mans.[2] Out of the ten to twelve races that took place in 2009, Team Falken Tire attended three--in Long Beach, California; Monterey, California; and Atlanta, Georgia. The team stepped up its activity in 2010 and participated in all ten races held that year, which

---

[2] The 24 Hours of Le Mans (or, 24 Heures du Mans) is the world's oldest active automobile endurance race. John Mannheimer, The Complete History of 24 Hours of Le Mans, HiConsumption (July 23, 2018), https://hiconsumption.com/ history-of-24-hours-of-le-mans. The first race took place in 1923 as a trial for automobiles to test their mechanical endurance and durability. The race is an annual event near the town of Le Mans, France. Id.

[*4] sprawled from California to Florida, Georgia, Connecticut, Wisconsin, Utah, and Canada.

Martin was hired to look after Landmark's cars' transmissions and gearboxes[3] on the road at these races and also occasionally at its shop in Lake Elsinore. He's not just a repairman, though--he makes his own gear boxes and "come[s] up with trick ratio[s] for certain race track[s]."[4] Landmark paid him for this--$72,141 in 2009 and $44,058 in 2010. To sweeten the deal, Landmark required Martin to work only on an "as-needed basis" and left him free to seek other work. Martin also had many or all of his travel expenses associated with his Landmark work reimbursed or paid directly.

Martin used this freedom to pick up side work for "many, many, many teams"--though when asked, he couldn't remember the names of these teams or how much they had paid him. The record does show that Martin worked at least a

_____

[3] A gearbox is "the second stage in the transmission system, after the clutch," and provides a selection of gears for different driving conditions and speeds. How Manual Gearboxes Work, How A Car Works, https://www.howacarworks.com/basics/how-manual-gearboxes-work (last visited Mar. 22, 2021). For example, "[t]he lower the gear, the slower the road wheels turn in relation to the engine speed." Id.

[4] A gear ratio is a direct measure of the ratio of the rotational speeds of two or more interlocking gears. These ratios provide a vehicle with motion and torque. See id.

[*5] little for a company named Gilbert Engineering, LLC, during the years at issue, and likely also in 2008. He received checks from Gilbert that were made out to John Martin Racing of $10,000 in 2008; $2,000 in 2009; and $7,000 in 2010, but we have in the record a Form 1099-MISC, Miscellaneous Income, only for 2010. Mrs. Martin was in charge of recording Mr. Martin's expenses, budgeting, and event management while he was on the road working different jobs.

2. The Martins' Ongoing Litigation

The Martins were involved in three legal proceedings during both years at issue. They deducted $6,500 for 2009 and $20,000 for 2010 for "Legal and professional services" connected with these lawsuits on their Schedules C, Profit or Loss From Business, for John Martin Racing, which the Commissioner disallowed in full. All three suits relate to "five separate parcels of real property," which the Martins owned or at least claimed an interest in. One was the Kirby property, which the Martins had bought back in 1986 but later transferred to Mary and Leonard Gruntz--Mrs. Martin's late parents--for "convenience". Things only get more complicated for the other parcels. The Martins may have owned some of these directly, or may have just contributed funds to a joint venture of sorts called the Eastridge Group, which did the actual purchasing of properties on behalf of the

[*6] Martins and others. Court filings signed by the Martins state that the Eastridge Group is "an organization started for the benefit of [the] claimants," i.e., Mrs. Martin's family.

The lawsuits whose expenses the Martins want to deduct all relate to problems that these properties brought them. The first was brought by a man who was injured while working on the Kirby property. He sued the Martins and Mrs. Martin's family to recover workers' compensation, and the case was still pending at the time of trial. The second and third lawsuits arose out of Robert and Charlene Gruntz's[5] divorce proceedings and Charlene's related bankruptcy case, in which there was a dispute within the Gruntz family about the ownership of multiple parcels of land. The Gruntzes (including Mrs. Martin) were somehow convinced that it would be a good idea to transfer the "five separate parcels of real property" to Charlene so that she could obtain financing and hold the properties for the benefit of the family. Charlene then proceeded to "borrow[] three-quarters of a million dollars against" the properties unbeknownst to the family. So when Rob and Charlene's marriage went south the Gruntz family--including Mrs. Martin--joined the divorce proceedings in 2004 to protect their interests in these properties. In 2009 they also sued to quiet title to and determine the bankruptcy

---

[5] Robert is Mrs. Martin's brother; Charlene is her sister-in-law.

[*7] estate's interest in the Kirby property.[6] As of trial, it is unclear whether these interfamily property disputes have been resolved. The Martins did not produce documents to support these expenses, and they were unsure which expenses related to which lawsuit and which attorney was handling them. Nor could they explain how these lawsuits had anything to do with John Martin Racing.

3. The Irvine Home

The Martins' home is in Irvine, California. They have owned a house there since 1972. For the years at issue, they took home-office deductions of $15,471 and $6,205. Their reported 2009 home-office expense equaled the difference between their other Schedule C expenses and John Martin Racing's gross income for the year. If allowed as a deduction, it would wipe out the company's profit completely.

On their Forms 8829, Expenses for Business Use of Your Home, for both years at issue the Martins listed 2,400 square feet as the "Total area of home." Of this 2,400 they claimed that Mr. Martin used 800 square feet for John Martin Racing. We have only the Martins' testimony in support of their assertion, and

_____

[6] At trial, Mrs. Martin said that she doesn't claim an ownership interest in the Kirby property and that she has never done so. She says that her parents were "the only ones who have ever owned the property." This contradicts statements made in legal filings that made clear her belief that she held an ownership interest.

**[*8]** Mr. Martin admitted that he "didn't do much [work] out of Irvine," even if he did have an office and half of his "garage taken up" there. This seems especially true given the transient nature of Mr. Martin's work.

4.      The Indiana House

The last contested deductions all arose from the great tragedy of the Martins' lives. They had a son named John, Jr., whom it is clear they loved dearly. John, Jr., had inherited his father's love for racing and his skill as a top-flight mechanic. He owned a house in Indianapolis and was working as a crew member on a racing team with his father in 2004 when he was killed in an accident while on vacation.

After this tragedy, the Martins took over their son's Indiana home. Mr. Martin testified that he turned the house into his car-building "headquarters," and says that "it's basically [his] workshop" where he keeps all of his best tools. It is certainly the case that the Martins have deducted the utility and mortgage interest expenses of owning the house on their Schedules C for the years at issue. Mr. Martin says the expenses are for his business--it's close to the Indianapolis Motor Speedway, which is a key part of Martin's strategy for promoting his own business. (It is not an expense of Mr. Martin's work for Landmark because Landmark neither traveled to Indiana for races during the years at issue nor

**[*9]** required Mr. Martin to travel to Indiana for some other purpose.)  This promotional strategy, which also involves driving in the vintage-racing series and mingling with fellow vintage-car owners and vendors, has not been noticeably successful.  The only Indiana work that Mr. Martin could recall was "redesigning the cooling system and doing an engine" for a friend's customer in what he thinks was 2009.  This project took "a couple of weeks" to complete.  Mr. Martin also said that he would often drive to Indianapolis from Long Island, New York, where he was working other jobs during 2010, because he didn't have the proper equipment for certain projects.  At some point, he "had an office set up in there" so that he could "do the office work" and have vendors and clients come over.  As in 2009 there was not much of this work.  Indeed, we learned of no specific work done at the Indiana house in 2010 beyond a meeting with a radiator company, C&R Radiator; and a gear company, Memco Gear.  There is also nothing in the record about Mr. Martin's work on Long Island that year.

Only Mr. Martin spent time at the Indiana house during 2009.  During that year he did not spend June at the Indiana house as he would have normally, because "[the Indy] didn't have the vintage car race * * * that year," but said he was there for the majority of May and "in and out" on various weekends for a total of 25-30 days.  The same is true for 2010--he was there only for most of May, but

[*10] absent in June.  He claims to have visited the Indiana house more frequently throughout 2010 but could not confirm when.  The house was vacant at all other times, though the neighbors would look out for it out of respect they have for the Martins' late son.

B.    Returns, Audit, and Trial

  1.    2009-10 Returns and Audits

The Martins disagree over who prepared their tax returns for the years at issue.  Mr. Martin claims that he prepared the 2009 return himself, but that their 2010 return was prepared by some man Mr. Martin thought was named Paul Baker.  Mr. Baker was not a CPA but was an "ex-IRS agent."  Mrs. Martin, however, claims that she and her late aunt, Betty Azar, prepared the Martins' 2009 and 2010 returns.

Their 2009 return shows income of $98, which they offset with a $193 Schedule C[7] loss and a $1,705,711 NOL from their 1993-97 tax years.  This huge NOL was rolled over onto their 2010 tax return--this time on their Schedule C--easily canceling out their $25,000 in reported income.  Their 2009 return was filed late, on December 22, 2010, but they filed their 2010 return on time.

---

[7] The Martins said they used an accrual accounting method on their 2009 and 2010 Schedules C.

- 11 -

[*11] The Commissioner chose to audit them for 2009 and 2010. A revenue agent conducted the audit at their home in Irvine, where he determined that Mr. Martin did not use 800 square feet of the residence exclusively for John Martin Racing and adjusted this area figure downward. He also determined that their records of income were lacking, and he conducted a bank deposits analysis (BDA).

This led the Commissioner to conclude that the Martins had underreported their income and impermissibly claimed deductions both for NOLs from the 1990s and for other expenses. Here's a summary of his findings from the BDA:

|  | 2009 | 2010 |
| --- | --- | --- |
| Taxable business deposits | $84,141 | $58,458 |
| Reported Schedule C gross receipts | 72,141 | 55,558 |
| Proposed adjustment | 12,000 | 2,900 |

The BDA turned up more than just extra checks made out to John Martin Racing, but this is what the Commissioner asks us to focus on. The proposed adjustment for 2009 is for two checks from Gilbert Engineering, one of which was for $10,000 and dated December 22, 2008. The Martins did not provide a Form 1099 for 2008 that reflected this $10,000 check, nor was the first page they provided of their 2008 return helpful. The 2010 adjustment was for a $1,000

[*12] check from "Arlington Farms" and an additional $1,900 from Landmark that didn't make it onto the return or the corresponding 1099 for the year.

This was not the Martins' first collision with the Commissioner. He had also already audited their 2007-08 and 2011-12 tax years. Those audits settled, and the Martins argued in a motion for partial summary judgment that these settlements preclude the Commissioner from challenging the existence or amount of their NOL carryforward for the years before us.

We analyzed and rejected this argument in an order before trial. These defenses do not apply here because the Commissioner's concessions for prior tax years do not preclude him from challenging the same issues for later years. Cf. Hopkins v. Commissioner, 120 T.C. 451, 456-57 (2003).

2. Trial

We tried this case in Los Angeles.[8]

Rod Everett, the owner of Landmark--the company for which Mr. Martin did contract work as a mechanic--credibly testified that Mr. Martin was free to take other jobs outside of his work with Landmark, that Landmark often

---

[8] The Martins lived in California at all relevant times. That means this case is appealable to the Ninth Circuit, unless the parties stipulate otherwise. See sec. 7482(b)(1)(A). All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

[*13] reimbursed him for any out-of-pocket expenses he incurred while on the road for that work, and that none of Mr. Martin's work for Landmark required him to be in Indiana during the years at issue.

Mr. Martin's testimony about the years at issue was less credible. He couldn't explain why the income he earned from clients other than Landmark was not reported. He couldn't tell us the amount of this income that was missing from his returns, but did say that he's "sure" he was paid by jobs other than Landmark. He couldn't tell us about the large NOLs carried forward from the 1990s to his returns for the years at issue. Mrs. Martin was more helpful. She credibly testified that the $10,000 check from Gilbert Engineering dated in 2008 but deposited in 2009 would have been included in the Martins' 2008 income. She also told us that, to her knowledge, there was no income for the years at issue other than Social Security benefits, the amounts reported on Forms 1099 from Landmark, Gilbert Engineering, and her own earnings from caring for her aging parents.

The Commissioner introduced no evidence at trial that the IRS employee who made the initial penalty determination had written approval from his immediate supervisor.

- 14 -

**[\*14]**                                       OPINION

This is a fairly standard substantiation case, with a bit of unreported income. The gist of the Martins' argument is that because their NOLs had been allowed in the past, they should be allowed here as well. They also argue that they did not underreport their income as the deductions they claimed on their Schedules C were proper.

The Commissioner disagrees.

I.      Unreported Income

We'll shift first to the question of unreported income. We typically give a presumption of correctness to the Commissioner's notices of deficiency and place the burden on the taxpayer to prove otherwise. See Welch v. Helvering, 290 U.S. 111, 115 (1933). But this case is appealable to the Ninth Circuit, which requires that the Commissioner first show "some evidence * * * which would support an inference" of the taxpayer's involvement in the activity during the year at issue for the presumption to apply. Weimerskirch v. Commissioner, 596 F.2d 358, 361 (9th Cir. 1979), rev'g 67 T.C. 672 (1977). The Commissioner has more than met this burden, as he has shown that Mr. Martin works and has worked as a mechanic in the racing industry for many years--the same industry from which this alleged

- 15 -

[*15] unreported income stems.  The Commissioner has therefore correctly

attributed the Martins' unreported income to John Martin Racing.[9]

A.      Bank Deposits Analysis

When a taxpayer does not keep adequate records of his income, the

Commissioner may reconstruct it, see secs. 6001, 446(b), and may analyze the

taxpayer's bank deposits to do so, see Palmer v. IRS, 116 F.3d 1309, 1312 (9th

Cir. 1997) ("IRS may rationally * * * reconstruct income where taxpayers fail to

offer accurate records."); Parks v. Commissioner, 94 T.C. 654, 658 (1990); see

also LeBloch v. Commissioner, 311 F. App'x 960, 961 (9th Cir. 2009), aff'g in

part, rev'g in part, and remanding T.C. Memo. 2007-145.  A BDA assumes that all

money deposited in a taxpayer's bank account during a given period is taxable

income, and unexplained deposits are considered *prima facie* evidence of income.

See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); see also United States v.

Helina, 549 F.2d 713, 715 n.2 (9th Cir. 1977).  Taxpayers then have the burden to

show that such deposits shouldn't be taxed because they were inheritances, loan

proceeds, transfers from another personal account, or other nontaxable transfers.

---

[9] The Commissioner also found that the Martins failed to report their Social Security income for both years.  The Martins did not contest these amounts in their petition or raise the issue at any later time.  This means they have conceded the issue.  See Rule 34(b)(4).

[*16] See Palmer, 116 F.3d at 1312.  The Commissioner has to subtract reported income and income from nontaxable sources that he knows about.  Helina, 549 F.2d at 715 n.2.  If taxpayers believe the Commissioner's method of computation is unfair or inaccurate, however, they have the burden to show that unfairness or inaccuracy.  Palmer, 116 F.3d at 1312.

The Martins did not provide complete records of their income or deductions to the Commissioner, so we find that he was allowed to reconstruct it.  He did this using the Martins' joint checking account at JP Morgan Chase for both years at issue.  He properly subtracted previously reported income and nontaxable transfers.  This analysis led him to determine that the Martins had underreported the income for the years at issue.  The extra income was not enormous, but we do find that the Martins received it:  $12,000 in 2009 and $2,900 in 2010.

The Martins do not directly dispute the Commissioner's BDA.  They also really didn't give much of an excuse beyond a claim that Mr. Martin often received reimbursements for expenses from Landmark, or that Mrs. Martin feels confident that she reported on their returns all of the income that she knew of.  But the Martins point us to no specific record of expenses for Mr. Martin that would allow us to conclude that any of the excess deposits in 2010 were reimbursements, rather than payments for the work Mr. Martin did.

**[*17]** The one strong argument the Martins have is about that $10,000 check. The check is dated in late 2008 and was deposited very early in 2009, and it seems plausible the Martins reported this income for 2008, and already paid tax on it. But the Commissioner says that we have no way of knowing whether the funds were actually taxed for 2008 because the Martins failed to introduce a Form 1099 from Gilbert Engineering for that year or for 2009. The Commissioner also argues that it's possible that the check was not even received until 2009.

So what to do? Our precedent on this issue makes clear that for a cash-method taxpayer, a check is included in income for the year in which it is received, even if not cashed until the following year. Kahler v. Commissioner, 18 T.C. 31, 34-35 (1952) (check received after 5 p.m. on December 31, 1946, and cashed January 2, 1947, was a cash equivalent upon receipt and properly included in 1946). John Martin Racing, however, reports income on an accrual basis, which means it recognizes income when it is earned (as opposed to received). And for income to be earned (and recognized) under this method, all events necessary to fix the Martins' right to receive that income must have occurred, and the amount of income must be able to be determined with reasonable accuracy. See sec. 451(b); sec. 1.446-1(c)(1)(ii), Income Tax Regs.

**[*18]** All events that fix this right generally occur on the earliest of the following: (1) the date payment is received, (2) the date payment is due, or (3) the date of performance. Harkins v. Commissioner, T.C. Memo. 2001-100, 2001 WL 427629, at *4 (citing Schlude v. Commissioner, 372 U.S. 128 (1963)). The Martins have not provided us with much information to make this "all events" test workable. We don't have an agreement between Mr. Martin and Gilbert Engineering, or even any testimony that would allow us determine when he actually performed the work or when payment for his services would have been due. Nor do we have Forms 1099 for either 2008 or 2009. All we have is a copy of the check bearing a late December 2008 issuance date, but we cannot confirm the date the Martins received it. We could assume that the date of the check was the date that payment "was due," but we can't be sure.

With nothing else left, all we can do is look at the BDA for the Martins' 2009 tax year. It shows that the $10,000 check from Gilbert Engineering is the second deposit and that it was deposited on January 9, 2009. The only deposit preceding it is a Social Security check, deposited on January 2, 2009, and bearing a date of December 17, 2008. Based on this first deposit's having been made on January 2, 2009, we infer that, had the Martins already received the $10,000 check, they would have deposited it at that time. Instead, it was deposited seven

[*19] days later, which makes us feel that it is more likely than not that they received it in January 2009. With no better evidence to decide otherwise, we find on a very slight preponderance of evidence that this January 2009 date of receipt is the triggering event of the "all events" test, making this $10,000 properly includable for the Martins' 2009 tax year. We also find the Commissioner's BDA valid as to all other unreported income.

II.    Deductions

The remaining issues concern whether the Martins are entitled to the deductions that the Commissioner disallowed or adjusted downward. We'll start with the very large NOLs--over $1.7 million.

A.    NOLs

1.    General Rules

Section 172(a) allows a deduction for an NOL for any tax year in an amount equal to the sum of (1) the NOL carryovers to such year and (2) the NOL carrybacks to such year. The Code defines an NOL as the excess of deductions allowed by chapter 1 of the Code over the gross income, subject to certain modifications. See sec. 172(c). For the years at issue[10] a taxpayer must generally

_____

[10] The Tax Cuts and Jobs Act of 2017 (TCJA), Pub. L. No. 115-97, sec. 13302, 131 Stat. at 2121, amended section 172(b) by repealing the NOL carryback
(continued...)

[*20] carry any NOL back to each of the two tax years before the year of the loss, and then carry it forward to each of the twenty tax years after the year of the loss. See sec. 172(b)(1)(A), (2). The Martins, however, claim that their NOLs date back to the 1990s. And for the tax years ending in 1993-97 the carryback period was three years and the carryforward period was fifteen years. Sec. 172(b)(1)(A) (1996).[11] Taxpayers can elect to forgo a carryback, but without a timely action they must carry NOLs back before they can carry them forward. Sec. 172(b)(2) and (3). An election to waive a carryback must be made by the due date of the return "for the taxable year of the net operating loss for which the election is to be in effect." Sec. 172(b)(3).

The Martins bear the burden of substantiating their NOLs by establishing their existence as well as the amount that may be carried over to the years at issue. See Rule 142(a); Powers v. Commissioner, T.C. Memo. 2013-134, at *44. As part of that burden, the Martins needed to have filed with their 2009 and 2010 returns a concise statement setting forth the amount of the NOL deduction claimed and all

---

[10](...continued)
and allowing for an indefinite carryforward.

[11] The Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 1082(a), 111 Stat. at 950, amended section 172(b)(1)(A) to include a two-year carryback and twenty-year carryforward.

**[*21]** material and pertinent facts, including a detailed schedule showing how they computed their NOL deductions. See sec. 1.172-1(c), Income Tax Regs. The minimum showing that they must make is as follows:

- they had an NOL for at least one tax year before 2009;

- they elected to waive a carryback of that NOL, or if not, that the NOL could not be fully applied against the income of the three years immediately preceding the tax year of the NOL;

- the NOL could not be applied against income for the tax years immediately following the tax year of the NOL; and

- both 2009 and 2010 are no more than fifteen years after the tax years of the NOLs they want applied.

See Green v. Commissioner, T.C. Memo. 2003-244, 2003 WL 21940722, at *3.

The Martins' bankruptcy proceedings could also affect the viability of their NOLs, because when someone files a bankruptcy petition, a bankruptcy estate springs to life and takes over his interests in property, which includes certain tax benefits such as NOLs. See 11 U.S.C. sec. 541 (2000). And NOLs might not come out of bankruptcy untouched--a taxpayer who files for bankruptcy may elect to terminate his tax year after he files his bankruptcy petition. Sec. 1398(d)(2). If so, the bankruptcy estate gets to use any existing NOLs to offset income earned during the debtor's own pre-petition tax year. See sec. 1398(d)(2), (i); Kahle v. Commissioner, T.C. Memo. 1997-91, 1997 WL 71701, at *3. And that's not all--

**[\*22]** any amount of debt that is forgiven by the discharge is excluded from a taxpayer's income, sec. 108(a)(1)(A), but reduces his NOL, sec. 108(b)(3).

### 2. Do the NOLs Make it Across the Finish Line?

With that said, we'll look at what the Martins offered to substantiate their NOLs--which isn't much. They provided no evidence about the composition of their NOLs for those long-ago 1993-97 tax years, when they suffered those losses. They instead argue again that prior audits that left their NOLs untouched should control in this case. We've rejected that argument already but will try to explain our reasons again. The key point is that each tax year stands on its own, with each year being the origin of new liability and a separate cause of action. Koprowski v. Commissioner, 138 T.C. 54, 60 (2012). This means that the doctrine that the Martins invoke--res judicata--doesn't apply. The other legal phrase they use-- collateral estoppel--serves them no better because, even if the same issues were on the table, they were settled in earlier cases by stipulated decisions--and collateral estoppel requires a decision, not just a settlement. See Sands v. Commissioner, T.C. Memo. 1997-146, 1997 WL 125823, at \*5; aff'd without published opinion sub nom. Murphy v. Commissioner, 164 F.3d 618 (2d Cir. 1998). "It is well settled that the Commissioner's failure to challenge a taxpayer's treatment of an item in one year is irrelevant in the determination of the proper treatment of a

[*23] similar item in a different taxable year." Little v. Commissioner, 106 F.3d 1445, 1453 (9th Cir. 1997), aff'g T.C. Memo. 1993-281. This means that just because the Commissioner accepted the Martins' treatment of their NOLs in prior years doesn't mean he has to in later years. The stipulated decisions from the Martins' previous audits do not control here.

Beyond this, the Martins offered only incomplete 1993-2008 tax returns and minimal testimony to support their position. They say that John Martin Racing-- their 1990s racing team--incurred expenses of around $1.7 million after a big donor fell through. We do have their 1993 tax return, which does show that they reported an NOL of $782,584 on their Schedule C. Their 1994 tax return reveals a business loss of $223,177 and a separate NOL deduction of $1,448,586, but did not provide a compilation of these losses. The Commissioner observes that the 1994 NOL deduction must have been carried forward from prior tax years-- $782,584 from 1993 and $666,002 from 1992 or earlier. This is bad news for the Martins because it means that the 15-year carryforward limit expired with their 2008 tax year, eliminating any possibility of using this $1,448,586 from the 1993 tax year and before. See sec. 172(b)(1)(A)(ii).

That leaves them with a baseline carryforward equal to the difference between what they reported for 2009 ($1,705,711) and what expired in 2008

**[*24]** ($1,448,586)--an NOL of $257,125. But looking at the evidence that would support their NOLs from 1994 and forward, we don't think it's enough to see them through. There is a huge gap in their evidence: They did not produce their tax returns for 1997-2002. We have their account transcripts in the record, and they give us some idea of what went on during this time, but these transcripts lack any computation of the sort that must accompany a claimed NOL deduction. We are also troubled by the possible effect of their 1998 bankruptcy discharge. The Martins received their discharge on April 6, 1998, at which point any surviving NOLs were returned to them. But we cannot tell from the record the amount of debt that they had discharged in their bankruptcy case under section 108(a)(1)(A)--debt forgiveness which would be excluded from their income, but that would in turn reduce their NOLs. We also have no way of knowing whether their NOLs were used to offset any income their business earned while the bankruptcy case was pending. See sec. 108(b)(1) and (2), (d)(8). They may very well have zeroed out their NOLs back then. That they reported positive income for their 1999-2001 tax years makes this likely.

The Martins also produced only the first pages of their Forms 1040 for tax years 2003-04 and 2006-08. They produced nothing at all for 2005. For 2002 their adjusted gross income was negative $371. Then a very large Schedule C

[*25] loss--$1,684,615--appeared on their 2003 return without explanation and without a Schedule C. A similarly large loss of $1,663,178 appears on their 2004 return, also without explanation or a Schedule C. We suspect the Martins arrived at this figure by simply subtracting their 2003 losses from their 2004 earnings. Our suspicion is strengthened when we consider the 2006-08 returns (that is, the first pages of those returns, since that is all we have); for each of those years, the Martins claimed an NOL carryforward deduction in an amount equal to the total income reported on the previous tax year's return.[12] Those deductions are also accompanied by a notation claiming that the losses arose from 1993-98 and were "audited by IRS." This leads us to believe that the Schedule C losses reported on the 2003 return would have arisen between 1993 and 1998[13]--the same losses that were probably zeroed out by the 1998 bankruptcy. Only the excess losses-- approximately $21,000--would have arisen from 2004-08.

But whether the Martins' claimed losses are from the 1990s or the 2000s matters little, because none of them are supported by anything but the Martins'

---

[12] The NOL deduction on the 2006 return actually matches the total reported income on the 2004 return, but the Martins didn't produce their 2005 return.

[13] We also think that if the Martins had incurred nearly $1.7 million in losses in 2003, they would have mentioned it at some point during the life of this case--just as they had the fact that they lost that same amount between 1993 and 1997.

[*26] word.  All we have are fragments of the Martins' returns for those years, and zero documentation to support them--an absence of evidence that we are allowed to consider when deciding the validity of an NOL.  See Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 274 (1990).  All of this leads us to find that the Martins are not entitled to their claimed NOL deductions for the 2009-10 tax years, regardless of whether these losses survived prior audits.[14]

B.    Legal Expenses

The Commissioner also takes issue with the legal expenses that the Martins deducted on their Schedules C for both years at issue:  $6,500 for 2009 and $20,000 for 2010.  He disallowed these deductions on the grounds that the Martins neither incurred nor paid them, and that they were not ordinary and necessary.

Section 162(a) allows a taxpayer to deduct ordinary and necessary expenses, including legal expenses that are related to a taxpayer's business.  See Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 720-21 (1977).  Section 212 also allows

---

[14] The Martins also argue that "[i]f the referenced [Schedule C] expenses, are moved to Schedules A, only then would the NOL be an issue in this case, also raising the specter of whether an 'NOL Carryforward,' would apply to 'vitiate or offset' any claimed SE TAX."  But as the Commissioner points out, "section 1402(a)(4) prohibits a taxpayer from offsetting net earnings from self-employment with an NOL carryforward or carryback."  DeCrescenzo v. Commissioner, T.C. Memo. 2012-51, 2012 WL 612493, at *3 (citing Ding v. Commissioner, T.C. Memo. 1997-435, aff'd, 200 F.3d 587 (9th Cir. 1999)), aff'd, 563 F. App'x 858 (2d Cir. 2014).

[*27] individuals to deduct ordinary and necessary expenses paid or incurred for the production of income; or for the management, conservation, or maintenance of property held for the production of income. Sec. 212(1) and (2). To be deductible under either section, these expenses must not be personal and must also not be capital--capital expenses have to be added to the basis of the capital asset and taken into account either through depreciation or in calculating any capital gain or loss when the asset is sold. See secs. 262(a), 263(a); Woodward v. Commissioner, 397 U.S. 572, 574-75 (1970); Boagni v. Commissioner, 59 T.C. 708, 712 (1973). The line can be fuzzy, but the Code tells us that a taxpayer cannot deduct "[a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate," sec. 263(a)(1), or for "[a]ny amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made," id. para. (2).

How do we determine the character of a deduction for legal expenses? In cases where the litigation involved the acquisition or disposition of capital assets, we look to the *origin and character of the claim*, rather than the taxpayer's primary purpose in litigating the claim. Boagni, 59 T.C. at 713; see also Woodward, 397 U.S. at 578-79. We also look to the origin of the claim to determine whether legal expenses are personal or are connected with profit-

[*28] seeking activities. Gilmore v. United States, 372 U.S. 39, 47-48 (1963); Keller Street Dev. Co. v. Commissioner, 688 F.2d 675, 678-79 (9th Cir. 1982), aff'g T.C. Memo. 1978-350. We look at all the facts and circumstances of a case when we apply this test, but the most important is how the litigation arose. See Gilmore, 372 U.S. at 49; Boagni, 59 T.C. at 713. It is settled, for example, that legal fees a taxpayer pays to defend his title to property are nondeductible capital expenditures. Reed v. Commissioner, 55 T.C. 32, 40-41 (1970); Barr v. Commissioner, T.C. Memo. 1989-420, 1989 Tax Ct. Memo LEXIS 418, at *21 ("[E]xpenses paid or incurred in protecting or asserting various other proprietary-type rights to property are also not deductible."); see also sec. 1.212-1(k), Income Tax Regs.

The Martins were involved in three different lawsuits around the time that they deducted legal expenses on the Schedules C of their 2009 and 2010 income tax returns. One of them was a lawsuit brought by a man who was allegedly injured while working on the Kirby property. We believed the Martins when they testified that they and Mrs. Martin's family were holding this land as an investment. In taxspeak, that means that we believe that they held the property for the production of income. Defending a lawsuit brought by someone who says he suffered personal injuries on the property is an "ordinary and necessary" expense

[*29] of the "management * * * of property held for the production of income."
Sec. 212(2). The Martins' purpose or intention in defending this suit may be to
avoid personal liability, but the suit's roots are in their ownership of their income-
producing land. We therefore find that the expenses to defend against this suit are
business expenses.

Section 212 allows their deduction. And, while the suit may originate in
their ownership of this property, the expenses paid to defend against it do not
relate to their proprietary interest in the property or in its development or
improvement.

But this doesn't mean the Martins have shown everything they must to
prove their entitlement to deduct these expenses. Expenses still have to be
substantiated by adequate records that show their amount. Sec. 6001; sec.
1.6001-1(a), Income Tax Regs. The Martins also have to prove that they actually
paid those expenses. But they introduced no records about these legal expenses at
all. This means we cannot figure out the amounts, the dates the Martins paid
them, or whether the Martins paid them at all. We find these expenses
nondeductible for failure of proof.

The other two lawsuits arose from Mrs. Martin and her family's assertion of
their rights in properties that got mixed up in family drama. There is no doubt

**[*30]** that--if the Martins owned these properties at all--they owned them as investments. One of these suits was purely about defending title to properties, while the other had multiple causes of action, such as fraud, conversion, and constructive trust. The key point that's important in a tax case is that both these lawsuits arose from the *transfer* of interests in those properties to an opportunistic family member. This leads us to find that the Martins' expenses for these lawsuits are nondeductible capital expenditures under section 263. See Von Hafften v. Commissioner, 76 T.C. 831, 834 (1981).

What's more, the Martins placed the expenses related to all three lawsuits on the Schedules C of their returns, which means they were claiming them to be expenses of John Martin Racing, and there's just no proof whatsoever of that.

The Martins are not entitled to deductions for these expenses.

C.    Business Use of Irvine Home

The Martins also claimed home-office deductions, which the Commissioner reduced, but didn't entirely disallow.

Section 280A disallows deductions for the business use of a taxpayer's home. There are exceptions, however, and one of them is for "[c]ertain business use" of a designated portion of the home so long as it is "exclusively used on a regular basis" (1) as the taxpayer's principal place of business, (2) as a place of

**[*31]** business which is used by the taxpayer to meet with patients, clients, or customers, or (3) in connection with the taxpayer's trade or business where the workspace is a separate structure not attached to the taxpayer's home. Sec. 280A(c)(1). There is also an exception for any space that is used "on a regular basis as a storage unit for the inventory" held for use in the taxpayer's business-- but only if the taxpayer's home "is the sole fixed location of such trade or business." Id. para. (2).

The Martins failed to produce any evidence that they used 800 square feet (out of 2,400) of their home for Mr. Martin's business, and Mr. Martin even admitted that he "didn't do much out of Irvine." We find it hard to believe that Mr. Martin did any work there on a regular basis. We won't give them more than what the Commissioner allowed: $4,856 for 2009; and $4,166 for 2010.

D.    Indiana House Expenses

The last deduction we have to discuss is the Martins' deduction on their Schedules C of the utility and mortgage expenses for the Indiana house. The Commissioner disallowed the utility expenses altogether, and he moved the mortgage-interest expense to their Schedule A on the ground that these expenses were not ordinary and necessary for 2009 and 2010.

**[\*32]** An expense is "necessary" if it is "appropriate and helpful" to a taxpayer's business, and it is "ordinary" if it is "common or frequent" for the specific type of business. Luczaj & Assocs. v. Commissioner, T.C. Memo. 2017-42, at *7 (citing Deputy v. du Pont, 308 U.S. 488, 495 (1940)). Taxpayers must maintain records that allow them to establish their entitlement to deductions and also allow the Commissioner to determine their tax liabilities. Sec. 6001; Shea v. Commissioner, 112 T.C. 183, 186 (1999).

*Ordinary and Necessary.* The evidence before us tells us that Mr. Martin worked at least three jobs during the years at issue, and quite possibly more. Most of his work was for Landmark, which hired him to maintain and redesign the gearboxes of race cars. Mr. Martin did this work either at Landmark's own shop in southern California or on the road at racetracks. None of it took place in Indiana. Mr. Martin also worked for Gilbert Engineering. The 1099s that Gilbert sent him show a Colorado address. Mr. Martin also testified that he had work in Long Island, New York. But there is nothing in the record that shows Mr. Martin doing any work in Indiana.

The Martins' Schedules C are very telling. They show that nearly all of John Martin Racing's gross receipts came from Landmark. The rest came from Gilbert, save for a few thousand dollars that are unaccounted for. This is what the

**[*33]** evidence tells us, and it does not allow us to conclude that Mr. Martin's main place of business, or even a common place of business, was the Indiana house.[15] Mr. Martin says that this is where he did all of his networking and held his meetings. He also says that the Indiana house was where he did a lot of his work on transmissions, because it's where he kept his best tools. But he could remember only two possible meetings with vendors and one engine project he completed on a Saleen Mustang for a friend's customer during the years at issue. What's more, he admitted that he was absent for most of June during both years at issue--the month of vintage races that he himself said was important to his business. We therefore find that the expenses of the Martins' Indiana house were not ordinary and necessary expenses of John Martin Racing during the years at issue.

As the Commissioner points out, each year stands on its own. It might be that in earlier years or later years, the Indiana house was more appropriately considered the hub of Mr. Martin's business. But in 2009 and 2010 the work that Mr. Martin was doing for Landmark and his work in Long Island, New York,

---

[15] We do note that the Martins provided their utility bills for the Indiana house. The amounts they are able to substantiate based on these bills are $2,798 for 2009 and $2,596 for 2010--much less than what they had claimed. None of this, however, means that these bills were ordinary and necessary for John Martin Racing.

[*34] could not allow this to be the case, even if he did end up returning to the Indiana house now and then.

*Schedule A Mortgage Deduction.* The good news for the Martins is that they still get the benefit of a mortgage-interest deduction, just not on their Schedules C. Section 163(h)(3)[16] provides a "qualified residence interest" exception to the general rule under section 163(h) that an individual cannot deduct personal interest paid or accrued during the tax year. "Qualified residence interest" means any interest paid during a tax year on a loan secured by a taxpayer's "qualified residence." <u>See</u> sec. 163(h)(3)(A). A "qualified residence" is the taxpayer's "principal residence" or "1 other residence of the taxpayer which is selected by the taxpayer for purposes of this subsection."[17] <u>Id.</u> para. (4)(A)(i). A taxpayer may only deduct interest paid on the first $1 million of the loan if it was taken out to acquire the residence, <u>id.</u> para. (3)(B)(ii), or the first $100,000 if it is a home equity loan taken out for any other reason, <u>id.</u> subpara. (C)(ii). The

---

[16] We note that the TCJA, Pub. L. No. 115-97, sec. 11043, 131 Stat. at 2086, amended section 163(h)(3) to eliminate the deduction for home-equity indebtedness interest and reduced the home-acquisition indebtedness limit to $750,000 (at least through 2025).

[17] We note that the Code suggests that a taxpayer must specifically select a second residence to claim the deduction; but because the Commissioner made the adjustment himself we see no reason not to allow it.

**[*35]** Martins' loan was worth more than $100,000 during the years at issue, but we don't know whether the loan was incurred to acquire the Indiana house or for some other purpose. Id. The Commissioner, however, does not quibble with the indebtedness limitations of section 163(h), merely with the fact that the Martins' deductions were misclassified as business expenses instead of personal expenses. We therefore agree with the Commissioner that the Martins can take Schedule A deductions for the mortgage interest on their Indiana house.

III.   Addition to Tax and Penalties

The only remaining issues for us to resolve are whether the Martins are liable for a section 6651(a)(1) addition to tax for 2009 and section 6662(a) accuracy-related penalties for both 2009 and 2010.

A.   Section 6651(a) Addition to Tax

The Code imposes an addition to tax when taxpayers do not file their return on time. Sec. 6651(a)(1). Taxpayers can avoid this with proof that their failure was due to reasonable cause and not willful neglect. United States v. Boyle, 469 U.S. 241, 245 (1985). The Commissioner has met his burden here by providing the Martins' 2009 tax return, which bears a filing date of December 22, 2010-- nearly a year after it was due. The Martins provided no evidence to explain why they filed late. The Commissioner wins this one.

[*36] B.  Section 6662 Penalty

Section 6662(a) and (b)(2) imposes a 20% penalty when there is "[a]ny substantial understatement of income tax."  An understatement is substantial if it exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return."  Id. subsec. (d)(1)(A).  Taxpayers are also liable for this penalty if they "fail[ed] to make a reasonable attempt to comply with the provisions of the internal revenue laws."  Sec. 1.6662-3(b)(1), Income Tax Regs.

The Commissioner has the initial burden of production for these penalties. Sec. 7491(c).  He shouldered that burden here when he showed that the Martins substantially understated their income tax for 2009 and 2010--their understatement of tax exceeded 10 percent of the tax required to be shown for both years, and also exceeded $5,000 in 2009.  The Commissioner also met his burden to establish negligence for both 2009 and 2010 because he showed that the Martins claimed expired NOLs to achieve tax results that were "too good to be true," sec. 1.6662-3(b)(ii), Income Tax Regs., and that they failed to keep adequate books and records to support their various other deductions and income.

But the Commissioner committed a Graev error.  Part of the Commissioner's burden of production on the penalties at issue here is showing that they were "personally approved (in writing) by the immediate supervisor of

**[\*37]** the individual making such determination." Sec. 6751(b)(1); see Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016); see also Ford v. Commissioner, T.C. Memo. 2018-8, at \*6, aff'd, 751 F. App'x 843 (6th Cir. 2018). The Martins challenged these penalties in their petition. The Commissioner didn't introduce any evidence at trial that his agent had gotten the required approval. The Martins are for this reason alone not liable for the accuracy-related penalty determined against them for 2009 or 2010.

With no outright victor,

Decision will be entered under

Rule 155.